[Civ. No. 9087. First Appellate District, Division Two.—July 9, 1934.]

RELIANCE ACCEPTANCE CORPORATION (a Corporation), Respondent, v. HOOPER–HOLMES BUREAU (a Corporation), Appellant.

Bronson, Bronson & Slaven for Appellant.

Louis E. Goodman, Louis H. Brownstone and Goodman, Bachrack & Brownstone for Respondent.

SCHMIDT, J., *pro tem.*—One H. O. Cummins had the exclusive Chrysler agency at· Vallejo, California. Commencing in 1925, respondent, a finance company, engaged in the business of purchasing new automobiles from distributors for dealers, and discounting and purchasing conditional sales contracts and other paper from such dealers, financed said Cummins in connection both with his purchase of new automobiles from the distributor and in connection with his conditional sales contracts. In August and September, 1929, respondent purchased from the distributor three new Chrysler sedans, which cars were then shipped and delivered to Cummins at his place of business in Vallejo. As security for Cummins reimbursing respondent for these three cars respondent took from Cummins trade acceptances and trust receipts, in which receipts Cummins acknowledged that said three automobiles were the property of respondent; that they were held by him in trust and that upon a sale of said automobiles or any of them he, said Cummins, would remit to respondent the amount of the trade acceptance, which trade acceptance and trust receipt contained the date of purchase, the amount of indebtedness, and the usual description of an automobile, such as type, motor number and serial number. The due dates of the respective indebtedness were one month after purchase, September 8, September 15 and October 4, 1929. In the ordinary course of his business Cummins sold the aforementioned cars on August 12th, September 4th and September 19th, respectively, but failed to notify respondent of any of the sales and appropriated· to his own use the proceeds of each sale. Respondent did not at any time inquire of Cummins whether he had disposed of the cars.

On January 23, 1930, respondent furnished appellant, a mercantile agency, with a typewritten list of approximately thirty automobiles which respondent had theretofore financed for Cummins, including the three aforementioned Chrysler

sedans. At the bottom of this typewritten list appeared, "Please check these cars at H. O. Cummins, 515 Marin street, Vallejo. Insurance Company request." The said list was the only communication, either oral or written, addressed by respondent to appellant in connection with. the checking of that particular list of cars. Respondent on other occasions had made request of appellant to make checks, these requests usually being made over the telephone. About the time respondent commenced to do business with appellant, which was several years prior to the check herein involved, an officer of respondent discussed with an officer of appellant that in making checks appellant should leave the impression with the dealer that appellant was checking for an insurance company.

After receiving the aforementioned list appellant sent an employee to the place of business of Cummins. There the employee exhibited a list of automobiles and stated he desired to check same. Cummins, or one of his men, went from car to car on the premises and read the serial and motor numbers thereon to said employee of appellant, who in turn checked the numbers on his list. At the time of this check Cummins did not have in his possession the three aforementioned Chryslers, the same having already been sold by him, but did have three other similar Chryslers which had been consigned direct to him by the distributor. In the course of the check Cummins had in his possession cards with the data concerning the three Chryslers involved herein and when he came to the three Chryslers that were then on his floor he read to the employee of appellant the motor and serial numbers not as they were on the three cars on his floor, but those upon the cards describing the three Chryslers already sold. The employee of appellant made his report accordingly and this report was on January 27, 1930, forwarded by appellant to respondent. Neither appellant nor its employee knew of any error in the report. At the time of the report Cummins was indebted to respondent on account of the three cars in the total sum of $3,817.15. Subsequent to this report Cummins collected on behalf of respondent payments totaling $675.75 paid by vendees on conditional sales contracts which Cummins had previously sold and assigned to respondent. Cummins embezzled this $675.75. On February 4, 1930, Cummins mailed respondent

his personal check for $675.75, which check, after being twice deposited for collection by respondent, proved to be worthless. Respondent immediately investigated and discovered the embezzlement. Nevertheless, respondent made arrangement with Cummins for the payment of the $675.75 out of commissions to be earned later by Cummins in business to be sent respondent by Cummins. On a few occasions prior to this respondent had received bad checks from Cummins and knew that he had theretofore embezzled their funds collected by him. All these checks had, however, been made good.

Subsequent to this $675.75 matter respondent continued to do business with Cummins. On February 24, 1930, Cummins forwarded to respondent for discount a conditional sales contract purported to have been signed by one D. D. Baker and supposed to represent the sale of an automobile by Cummins to Baker. Respondent purchased this contract for $1345. Later it was found that this contract was fictitious, neither the automobile mentioned in the contract nor said D. D. Baker existed.

After January 27th, respondent continued to discount conditional sales contracts on cars sold by Cummins and in connection with the repossession of said automobiles sustained a loss of $405.21.

On March 6, 1930, Cummins closed his place of business, whereupon he informed respondent of that fact and how he had misled the employee of appellant relative to the check of the three Chryslers involved herein. This was the first information respondent had of the falsity of the check in so far as it related to the three Chrysler cars. Respondent thereupon took an assignment from Cummins of his accounts receivable and took over the conduct of Cummins' business. conducting same for several months. Respondent, however, permitted Cummins to retain for his own use certain conditional sales contracts held personally by Cummins, on which contracts Cummins succeeded in collecting about $1,000. Later respondent permitted Cummins to sell for his own use the furniture and fixtures, upon which Cummins realized $200. During the period of the so-called liquidation Cummins continued as a salesman with respondent.

The evidence further showed that during the entire period that Cummins did business with plaintiff, Mr. Rap-

held, the president of respondent finance company, went to Cummins' place of business. In this connection Cummins testified: "During the five years that I was in business Mr. Rapheld of the finance company would come to my place of business approximately every month or six weeks, and I would discuss my business with him. This continued during all of the period I did business with the Reliance Acceptance Corporation—Rapheld always checked the cars on the floor—both new and used. There was no fixed time but I would say it would average every six weeks." Mr. Rapheld testified: "I know Mr. Cummins. Prior to March 5, 1930, I visited Cummins' place of business at Vallejo. I had no regular time of doing this but I would say three or four or five times a year. On many occasions I went over the books with him. On no occasion would I make a detailed survey of his cars because I would not be in a position to pass upon their condition other than in a general survey as the cars appeared on the floor. But his books I did check up with him from time to time; I would say probably two or maybe three times during the year I would look over certain items with him for partially our benefit and likewise for the purpose of assisting him if I could to catch any leakage he could overcome."

Respondent brought action in the lower court setting forth the employment of appellant to make the aforementioned check of January 27, 1930, the falsity of the report made by appellant, and claimed as damages for breach of contract the loss sustained by respondent on account of (a) the three Chrysler sedans; (b) $675.75 check; (c) the D. D. Baker transaction; and (d) the $405.21 loss on the repossession of cars. Upon findings of fact in its favor respondent had judgment against appellant for $6,263.11 consisting of (a) three Chrysler cars, $3,837.15; (b) collections made by Cummins not paid represented by bad check, $675.75; (c) amount advanced on the Baker fictitious sale contract, $1345; and (d) losses on used car contracts purchased after January 27, $405.21; total, $6,263.11.

From this judgment appellant appeals claiming that as a matter of law under the facts herein respondent was not entitled to judgment for any of the items set forth as one of said items proximately resulted from the breach by appellant of its contract.

■ (1) What is the liability of a mercantile agency which in good faith and without knowledge of the error informs a finance company that certain automobiles were on the floor of the automobile dealer? The measure of damage is fixed by section 3300 of the Civil Code: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." The rule is stated in 8 California Jurisprudence, page 759, as follows: "To warrant a recovery of damages, a causal connection must exist between the breach and the detriment . . . the breach must be the efficient cause of the detriment, the one that necessarily sets other causes in operation. Causes which are merely incidental, or instruments of some other controlling agency, are not proximate within the purview of the law. . . . " ■ We find the rule laid down in *Hadley* v. *Baxendale,* 26 Eng. L. & Eq. 398, as quoted in *Wallace* v. *Ah Sam,* 71 Cal. 197, at page 200 [12 Pac. 46, 60 Am. Rep. 534]:

" 'Now, if the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant, and thus known to both parties, the damage resulting from the breach of such a contract which they would reasonably contemplate would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated.

" 'But, on the other hand, if those special circumstances were wholly unknown to the party breaking the contract, he at the most could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances for such a breach of his contract.' " This interpretation of the rule of damages for breach of contract has been adhered to ever since. Bearing this rule in mind, can it be said as to the item of loss involved in connection with the three Chrysler cars that such loss naturally flowed from the breach of contract by appellant? The loss had already occurred through the criminal acts of Cummins. As to this item, had the report been true

what could respondent have done to collect upon its account that would have brought the money to respondent? A close analysis of the testimony shows that the financial condition from January 27th until the discovery of the error in the report caused by the fraud of Cummins remained substantially the same. This alleged item of damage is not therefore one which naturally proximated from the breach.

(2) The next item of damage resulting from a series of embezzlements of moneys collected and not turned over by Cummins to respondent could not by any stretch of imagination be the proximate result of the breach of contract by appellant. As to this item respondent knew a few days after receipt of the report from appellant that the check for $675.75 was not good. Mr. Rapheld, president of respondent, testified that the amount of the check could not be collected because Cummins did not have the assets. If respondent could not collect on the check of $675.75, how could respondent collect the $3,375 represented by the indebtedness on the three Chryslers?

(3) We do not believe that the Baker item could have been in the contemplation of the parties as a damage resulting from appellant's breach of contract. How could appellant anticipate that respondent would purchase fictitious paper—fictitious both as to person and car, and all the more so after respondent knew from prior checks, and more particularly from the $675.75 check, that Cummins was not to be trusted?

(4) The losses involved in item four arose from repossessions of cars upon which Cummins held conditional sales contracts of the vendees and which contracts respondent purchased. In no way were these cars or contracts connected with the three Chrysler sedans. Did respondent purchase same upon anything set forth in the report of appellant? No. Respondent must have purchased same upon the purported security of the cars named in the conditional sales agreements. The fact either that respondent would buy contracts where the security was inadequate, or that the market value of the security declined during the period involved between purchase of the contract and the subsequent repossession, was not within the contemplation

of the parties to the contract for the check of Cummins' cars.

From the foregoing views it necessarily follows that the judgment of the lower court is reversed.

Nourse, P. J., and Sturtevant, J., concurred.